**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **DIPANJAN NAG, Ph.D.,** ) | Case No. 2:20-cv-3471 |
| ) | |
| Plaintiff, ) | Judge _____ |
| ) | |
| v. ) | |
| ) | |
| **OHIO STATE UNIVERSITY,** ) | |
| ) | |
| and ) | |
| ) | |
| **OHIO STATE INNOVATION FOUNDATION,** ) | |
| ) | |
| and ) | |
| ) | |
| **BRUCE McPHERON, Ph.D., Personally and in His** ) | |
| **Official Capacity as Executive Vice President** ) | |
| **and Provost of Ohio State University,** ) | |
| ) | |
| and ) | |
| ) | |
| **MICHAEL PAPADAKIS, Personally and in His** ) | |
| **Official Capacity as Senior Vice President and** ) | |
| **Chief Financial Officer of Ohio State University,** ) | |
| ) | |
| Defendants. ) | |

**COMPLAINT WITH JURY DEMAND**

**I.  INTRODUCTION**

1. This is an action for compensatory and punitive damages as well as injunctive relief arising from a series of acts of race and national origin discrimination and retaliation by Defendants Ohio State University, the Ohio State Innovation Foundation, Ohio State University Provost Bruce McPheron, and Ohio State University Michael Papadakis, in violation of Title VII of the Civil Rights Act of 1964, as amended, the First and Fourteenth Amendments to the United States Constitution, and Sections 1981 and 1983 of Title 42 of the United States Code.

1

The Defendants subjected the Plaintiff, Dr. Dipanjan Nag, a former Ohio State University Associate Vice President and Ohio State Innovation Foundation officer, Dr. Dipanjan Nag, to a discriminatory hostile working environment. When Dr. Nag complained about the discriminatory treatment of himself and others in his department, the Defendants retaliated against him by interfering with his work and denigrating his performance.

Dr. Nag offered to resign to end the discriminatory and retaliatory treatment he was experiencing, but Defendant McPheron urged him to stay and pass up other job opportunities. On July 10, 2018, however, Dr. Nag was denied a promotion by Defendant Papadakis, expressly based on his protected complaints of discrimination and retaliation. And on August 10, 2018, the Defendants terminated Dr. Nag's employment with Ohio State University and his status as an Ohio State Innovation Foundation officer. Defendants McPheron and Papadakis openly told Dr. Nag the reason for his termination was his complaints of discrimination and retaliation. They then made false claims to government investigators—and Defendant Papadakis committed perjury by making a false statement under oath—about these retaliatory statements and actions.

## II.     JURISDICTION AND VENUE

2.      This Court has federal question jurisdiction over the Plaintiffs' claims pursuant to Title 28 U.S.C. Section 1331, this being an action pursuant to Title 42 U.S.C. Sections 1981, 1983, and 2000e, and the First and Fourteenth Amendments to the United States Constitution.

3.      At all relevant times, the parties resided and/or operated, and the events described herein took place, in Franklin County, within the jurisdiction of the Southern District of Ohio, Eastern Division.

**III.     PARTIES**

4. Defendant Ohio State University (hereinafter "OSU" or "the University") is a public university and a political subdivision of the State of Ohio. It is an employer for purposes of Title VII of the Civil Rights Act of 1964, as amended, with over 40,000 employees.

5. Defendant Ohio State Innovation Foundation ("OSIF") is an Ohio corporation not for profit affiliated with and wholly owned by OSU. OSIF's principal purpose is to license and market intellectual property created by OSU's academic departments in order to generate revenue for OSU.

6. Defendant Bruce McPheron, Ph.D., is OSU's Executive Vice President and Provost. He is OSU's Chief Academic Officer and the head of the Office of Academic Affairs. He has authority to make and execute university academic policy and is the top supervisor of all employees reporting through the Office of Academic Affairs, including the Plaintiff, at all relevant times during which he was employed by OSU. Defendant McPheron is a resident of Franklin County, Ohio, within the jurisdiction of the Southern District of Ohio, Eastern Division. He is sued in his personal and official capacities.

7. Defendant Michael Papadakis is OSU's Senior Vice President and Chief Financial Officer. He has authority to make and executive university financial policies, including policies affecting OSU's employees within the Technology Commercialization Office, where the Plaintiff worked at all relevant times. He is also chairman of the board of directors of OSIF. Defendant Papadakis is a resident of Franklin County, Ohio, within the jurisdiction of the Southern District of Ohio, Eastern Division. He is sued in his personal and official capacities.

8. Plaintiff Dipanjan Nag, Ph.D., is a United States citizen of Indian race and national origin. He is a resident of Union County, Ohio, within the jurisdiction of the Southern District of Ohio, Eastern Division.

9. The actions of the Defendants and their agents and employees, which were within the scope of their employment, were at all relevant times undertaken because of intentional discrimination and retaliation and conducted with malice and knowing disregard for the Plaintiff's rights under clearly established federal law.

## IV. FACTS

### *OSU Hires Dr. Nag as Associate Vice President of Technology Commercialization*

10. Plaintiff Dipanjan Nag (hereinafter "Dr. Nag") was hired by Defendant OSU as Associate Vice President of Technology Commercialization and appointed as an officer of Defendant OSIF in the summer of 2016.

11. Dr. Nag, who has a Ph.D. in biophysical chemistry as well as a Master of Business Administration (M.B.A.) degree, was very well recognized as an expert in the field of technology transfer—the commercialization of intellectual property developed within academic institutions—and came to OSU from a similar role at Rutgers University in New Jersey, where he had achieved excellent results.

12. In contrast, OSU's Technology Commercialization Office (TCO) had not been functioning well prior to Dr. Nag's arrival or at any point in its previous 15 years of existence. Dr. Nag was hired to turn around the office—that is, to address financial and personnel performance deficiencies and regain faculty confidence and trust in the office—and enhance the revenue-generating function of OSIF.

4

13.     The supervisor over Dr. Nag's role when he was hired was Matthew McNair, an OSU Vice President and the President and Chief Executive Officer of OSIF.  McNair, a white, American-born manager, had little expertise in technology transfer.  He had also staffed the TCO with a predominantly white, male, American-born staff that included a number of underperforming individuals.

14.     Dr. Nag quickly and capably achieved the results for which he was hired.  He enhanced the staff of the office with diverse and capable employees and held underperforming existing employees accountable (including, with authorization, eliminating some underperforming staff).  OSU's administration was well aware that he had greatly improved relations with the faculty served by the TCO, and that the TCO had begun a dramatic upward trajectory in its financial results.

15.     At the end of his first year of employment with OSU, Dr. Nag received favorable feedback and a substantial performance bonus based on the results he had already achieved.  And by August 2018, when Dr. Nag was terminated, the university was extremely pleased with the TCO's performance, and when OSU formally announced his replacement—a white male—it publicly acknowledged the TCO's "upward momentum" and the university's "record high in technology commercialization licensing income in 2018," which was more than double the income from 2017 and more than triple the income from 2016.  Faculty confidence in the office was also substantially improved, as demonstrated by both express statements of faculty approval of the TCO's and Dr. Nag's work and greatly increased submissions of faculty intellectual property through the TCO.  Both the TCO's financial progress and its improved relationship with OSU's faculty were consistent with and exceeded the university's expectations for Dr. Nag at the time of his hiring and throughout his employment.

### *Dr. Nag Observes, Experiences, and Reports Discrimination by His Supervisor*

16. Despite Dr. Nag's objective success, as both the diversity of the TCO's employees and its performance increased under his guidance, he and the female, non-white, and non-American-born staff within the TCO began to experience hostility from McNair and a portion of his close white, American-born confidantes.

17. When white and male employees resisted Dr. Nag's efforts to improve the office's performance (and their own individual performance), McNair routinely supported them and undermined Dr. Nag. This included, for instance, supporting one white male employee's criticism of Dr. Nag and escalating it to higher-level administrators and human resources staff, despite having specifically told Dr. Nag he should terminate the same employee for poor performance. McNair's actions also included meeting with Dr. Nag's subordinates and soliciting complaints and concerns about Dr. Nag's management without their having previously raised any such concern.

18. McNair also openly acted in a sexually and racially inappropriate manner in the workplace, including making crude sexual comments that appeared to make female employees uncomfortable, and directing name-calling and other disrespectful comments toward female university employees behind their backs.

19. McNair also directed similarly hostile, racially motivated behavior toward Dr. Nag, belittling and yelling at him without cause, and attacking his status within and outside the office by instructing him not to speak during meetings involving both OSU and OSIF (while allowing white employees with less expertise and knowledge of the subject matter of the meetings to speak). McNair and OSU's administration excluded Dr. Nag from public relations messages about the office's work while emphasizing the accomplishments of white, American-

born employees.  McNair refused Dr. Nag permission to speak to a panel arranged by a member of Congress despite a specific request from the member's staff, and refused to allow Dr. Nag to teach a technology transfer course for the TCO even though Dr. Nag had co-created the course.

20. In addition to his own inappropriate behavior and hostility based on race and national origin, McNair enabled such behavior by subordinates.  This included refusing to take action and discouraging the reporting of an episode in which a white employee openly mocked the Indian accent of one of Dr. Nag's Indian-born subordinates in front of that subordinate and many other staff members.

21. As part of his effort to undermine Dr. Nag, McNair continually reported to higher-level OSU administrators, OSIF officers, and OSU Human Resources officials that Dr. Nag was responsible for morale problems within the TCO.  This resulted in a series of assignments of management "coaches" from within and outside the university and the institution of multiple "360-degree reviews" or "360 reviews," in which feedback on Dr. Nag's management was solicited from his subordinates, peers, and supervisors.  Some coaching and similar reviews for new managers are very typical within OSU, but the continuous assignment and re-assignment of coaches and reviews for Dr. Nag was not at all typical for OSU managers who were achieving objectively positive results—regardless of whether or not those managers' employees were uniformly satisfied.

22. On February 25, 2018, Dr. Nag made a written internal report to OSU Human Resources, describing the hostile and abusive conduct by McNair detailed above and alleging that McNair's "unprofessional conduct has on multiple occasions devolved into creation of a hostile work environment based on sex, race, and ethnic origin."  In addition to describing the

7

pattern of discriminatory treatment, Dr. Nag's complaint referred to a "culture of fear" within the department and repeatedly noted his fear of retaliation or retribution for coming forward.

### *OSU's Internal Investigation Confirms McNair's Improper Conduct, But Results in a Pattern of Retaliation Against Dr. Nag.*

23. Dr. Nag's internal complaint resulted in a formal Human Resources investigation. But rather than simply seeking to identify and address McNair's discriminatory conduct, OSU Human Resources, OSU administrators, and OSIF officers responded by attacking Dr. Nag.

24. McNair, upon becoming aware of Dr. Nag's complaint, sought to turn it against Dr. Nag. Upon learning of the complaint, he engaged in discussions with Dr. Nag's then-performance coach, Dawn Costick, in early March 2018, in which he assured Costick he was not seeking to take action against Dr. Nag, then reported to Defendant Papadakis and the TCO's Human Resources officer, Judith Lang, that Costick believed Dr. Nag was "paranoid."

25. During the same period, McNair was also engaging in discussions with Lang and Papadakis whether Dr. Nag should be terminated—confirming the exact fears McNair had convinced Costick were "paranoid."

26. McNair also related to Papadakis and Lang in these discussions that Costick had concluded that "cultural issues stemming from growing up in India are part of the problem" for Dr. Nag. McNair said nothing to criticize or disclaim this clear incident of stereotyping based on race and national origin, nor did Papadakis or Lang.

27. Costick, besides openly attributing the issues in the department to Dr. Nag's Indian origin, actively pressured Dr. Nag to withdraw his internal complaint of discrimination, or to agree to resolve it directly with McNair, bypassing OSU's prescribed process for investigating such complaints. When Dr. Nag rejected Costick's urgings, Costick declared she had a "conflict of interest" and withdrew from the coaching assignment.

28. While the investigation was proceeding, McNair continued to treat Dr. Nag with hostility in the workplace, including excluding him from important ongoing assignments. Dr. Nag issued a follow-up complaint of retaliation to OSU Human Resources as a result.

29. On April 16, 2018, OSU Human Resources investigator Kristi Hoge provided a draft of her investigative report to Defendants Papadakis and McPheron, as well as the departmental Human Resources office. The draft report confirmed all or nearly all incidents of discriminatory conduct by McNair in Dr. Nag's complaint, but refrained from concluding that McNair violated any policy related to discrimination or retaliation. Such reports are consistent with the approach OSU Human Resources typically uses even where very clear discriminatory conduct has occurred.

30. Papadakis responded immediately by telling Hoge her report was "a bit light on the issues w[ith] respect to DJ [Nag] . . . I understand the investigation was of Matt [McNair], given DJ filed the complaint. However, given DJ's complaint and then follow-up retaliation complaint, we've spent almost 2 months dealing with the issues alleged, during which time we've been unable to actually move the office forward. . . ."

31. In response to Papadakis's feedback, Hoge incorporated harsh criticism of Dr. Nag's leadership performance into the final report regarding Dr. Nag's complaint, while dismissing McNair's confirmed discriminatory conduct as merely "inappropriate behavior" that did not violate any specific OSU policy.

### *OSU Denies Dr. Nag a Promotion and Terminates Him in Retaliation for His Protected Activity*

32. Following the Human Resources report, the retaliation against Dr. Nag by the Defendants continued.

33. Dr. Nag and McNair were encouraged to improve morale in the TCO by announcing to the staff that they were committed to working together. However, McNair continued to seek opportunities to undermine Dr. Nag's leadership, including badmouthing him to Lang, Papadakis, and others, and falsely blaming Dr. Nag for "failing to engage" with Costick.

34. In the early summer of 2018, McNair and Defendant Papadakis sought to subject Dr. Nag to yet another "360 review"—which would be his third in less than two years. McNair also began discussing Dr. Nag's annual performance evaluation, which he gave every indication to Dr. Nag would be negative, despite the objectively positive results the TCO had achieved.

35. Dr. Nag was concerned about the institution of a third 360 review, and became alarmed when he learned, from the consultant OSU hired to conduct it, that McNair was proposing to include an excessive number of participants, many of whom were closely aligned with McNair. The consultant informed Dr. Nag that this was unusual and counterproductive.

36. On June 27, 2018, Dr. Nag sent an email to Defendant McPheron, stating, "The way things are progressing with the 360 review process and the annual performance evaluation process for me, it is clear that Matt [McNair] is retaliating against me with support from HR." Dr. Nag informed McPheron that he had another potential job opportunity and that he was prepared to resign, effective at the end of July. He asked McPheron to delay the evaluation and the 360 review to allow for his resignation.

37. Defendant McPheron, in a telephone conversation responding to Dr. Nag's offer of resignation, as well as in subsequent conversations, encouraged Dr. Nag to stay on rather than accepting other positions. Dr. Nag agreed to do so.

38. On July 10, 2018, McNair abruptly announced his resignation from OSU and OSIF, effective at the end of the month.

39. On the same day, Papadakis ordered Dr. Nag into a meeting with himself and OSU Human Resources investigator Kristi Hoge. In this meeting, Papadakis harshly criticized Dr. Nag for his complaint of retaliation to Defendant McPheron, despite the fact that McPheron was both a direct and indirect supervisor of McNair as well as Papadakis's direct supervisor, and an appropriate person for Dr. Nag to approach about retaliation by those two men. Papadakis warned, "the reality is . . . You realize that all that stuff comes back to me, right?" and he repeatedly stated that Dr. Nag was "undermining" him and McNair by making complaints about their retaliation against him.

40. Immediately after rebuking Dr. Nag for his email, Papadakis then told Dr. Nag that there was going to be an interim leader to replace McNair, and stated, "I want to make it clear to you that you're not being considered for that. Your name is not in the conversation to be the interim leader of the office. We have a number of ideas that we're talking through, but that's not one of them. I want to make sure that's very clear." Papadakis then immediately returned to criticizing Dr. Nag's email to McPheron, stating, "I don't take that lightly."

41. A few weeks later, OSU and OSIF selected a white candidate with less technology transfer and intellectual property experience and expertise than Dr. Nag to replace McNair as an OSU Vice President and OSIF's President and CEO on an interim basis. The same white man was formally appointed to these positions on a permanent basis in 2019.

42. Following the July 10, 2018, meeting, Dr. Nag left the country for several days to attend to an urgent family medical issue in India. While he was out of the country, he received his annual performance evaluation. Despite the fact that McNair was imminently leaving his position, he prepared the evaluation. The evaluation was very negative and contained false, disparaging comments about Dr. Nag, including once again blaming him for the failure of

11

Costick's coaching assignment.  Two Human Resources reviewers, Hoge and Lang, had both previewed the evaluation and noted that it was not true that Costick's coaching assignment failed because of Dr. Nag, but they still allowed McNair to include the reference in his final evaluation.

43.  Dr. Nag reasonably believed McNair's evaluation was yet another discriminatory and retaliatory action against him.  He used OSU's procedure for responding to a performance evaluation and attached a statement indicating that he believed the negative evaluation was a further act of retaliation.  He sent his rebuttal to McNair and a representative of OSU Human Resources, and McNair immediately forwarded it to Defendant Papadakis, Hoge, and others.

44.  Shortly after Dr. Nag returned to the office, he was terminated.

45.  At the time of Dr. Nag's termination, the new, third 360-degree review had been completed, but its results had not yet been tabulated or reported to OSU administrators, and they were not the basis for the termination.

46.  Defendants Papadakis and McPheron met with Dr. Nag, on August 10, 2018, to inform him of his termination from OSU, which also resulted in his removal as an officer of OSIF.  In the termination meeting, Defendant Papadakis openly admitted that Dr. Nag was being terminated due to his protected activity, stating, "the last straw for me was that lengthy rebuttal that you sent a week or two ago back to all of us with regards to your performance review."  Defendant McPheron immediately agreed with Papadakis, stating that the rebuttal statement alleging retaliation was "just not the way you lead."  Both statements were made in the presence of OSU Human Resources officer Lang, who attended the meeting.

47.  OSU subsequently claimed Dr. Nag was terminated for cause and used this claim to revoke a payment he had received for his moving expenses and deduct the amount of the prior payment from his final wages.

48. OSU and OSIF subsequently replaced Dr. Nag with a white man. Dr. Nag's white replacement, unlike Dr. Nag, was featured prominently in OSU public relations postings, and, unlike Dr. Nag, he was allowed to speak publicly about the work of the TCO.

49. The actions of the Defendants described herein were undertaken with malice and knowing and reckless disregard for the Plaintiff's statutory and constitutional rights.

50. The actions of the Defendants have caused the Plaintiff loss of income, damage to his personal and professional reputation, anxiety, anger, humiliation, embarrassment, and stress.

51. The Plaintiff has exhausted all required administrative remedies for purposes of Title VII of the Civil Rights Act of 1964, as amended. He filed a dual charge with the Ohio Civil Rights Commission and Equal Employment Opportunity Commission on February 8, 2019. A notice of right to sue was issued on July 2, 2020, and is attached as Exhibit 1 to this Complaint.

52. During the investigation of the Plaintiff's charge by the Ohio Civil Rights Commission, Defendant Papadakis repeatedly gave false testimony, including false, perjured testimony in a written, sworn affidavit, in which he repeatedly denied the statements he made regarding his retaliatory motive for Dr. Nag's termination, even after having the statements read to him verbatim by a Commission investigator. Defendant McPheron also gave false testimony to the Commission's investigator denying both his own statements to Dr. Nag and Mr. Papadakis's statements.

53. On October 24, 2019, the Ohio Civil Rights Commission concluded there was probable cause to believe that Dr. Nag's termination by OSU was in retaliation for his protected activity. This finding was unanimously upheld by the Civil Rights Commission in February 2019 after a hearing upon reconsideration.

## V. CLAIMS FOR RELIEF

### A. DISCRIMINATION AND RETALIATION IN VIOLATION OF TITLE VII

54. The preceding paragraphs are hereby incorporated and re-alleged.

55. The race and national origin discrimination against the Plaintiff by Defendants Ohio State University and Ohio State Innovation Foundation, as well as their retaliation against the Plaintiff for his opposition to discrimination and retaliation and his participation in investigations related to discrimination and retaliation, violated Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. Section 2000e *et seq.*).

### B. DISCRIMINATION AND RETALIATION IN VIOLATION OF 42 U.S.C. SECTIONS 1981 AND 1983

56. The preceding paragraphs are hereby incorporated and re-alleged.

57. The Defendants' discrimination and retaliation against the Plaintiff constituted race discrimination in impairment of a contract and therefore violated 42 U.S.C. Section 1981, which is actionable directly against Defendant OSIF.

58. The same conduct is actionable under 42 U.S.C. Section 1983 against Defendants McPheron and Papadakis in their personal and official capacities.

### C. DISCRIMINATION AND RETALIATION IN VIOLATION OF THE UNITED STATES CONSTITUTION

59. The preceding paragraphs are hereby incorporated and re-alleged.

60. By discriminating against the Plaintiff in violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, and by discriminating and retaliating against the Plaintiff in response to his speech on a matter of great public concern and for raising equal protection concerns, the actions of Defendants OSIF, and of Defendants McPheron and

Papadakis in their personal and official capacities, violated Title 42 U.S.C. Section 1983 and the First and Fourteenth Amendments to the United States Constitution.

VI. **PRAYER FOR RELIEF**

61. **WHEREFORE,** the Plaintiff asks for judgment against Defendants and requests:

(A) Compensatory and punitive damages;

(B) An order reinstating the Plaintiff to his former employment with OSU and promoting him to the positions with OSU and OSIF previously held by Matthew McNair, whose position the Plaintiff would have filled but for the Defendants' discriminatory actions;

(C) The costs of this action, including reasonable attorney's fees;

(D) Pre- and post-judgment interest and compensation for the tax consequences of the delayed payment of the Plaintiff's compensation; and

(E) Any other relief deemed appropriate by the Court.

Respectfully Submitted,

/s/Frederick M. Gittes_____
Frederick M. Gittes (0031444)
fgittes@gitteslaw.com
Jeffrey P. Vardaro (0081819)
jvardaro@gitteslaw.com
The Gittes Law Group
723 Oak St.
Columbus, OH 43205
(614) 222-4735
Fax: (614) 221-9655
Attorneys for the Plaintiff

**JURY DEMAND**

The Plaintiffs hereby demand a jury of eight (8) to determine all issues triable by jury.

/s/Frederick M. Gittes_____
Frederick M. Gittes (0031444)